IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., ) <br> CHRISTOPHER RAYGOZA, #K-78157, ) <br> ) <br>           Petitioner, ) <br> ) <br>       v. ) <br> ) <br> JERRY BOHLER[1], Warden, Illinois River ) <br> Correctional Center, ) <br> ) <br>           Respondent. ) | No. 03 C 1727 <br><br> Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

After a bench trial in the Circuit Court of Cook County, Illinois, petitioner, Christopher

Raygoza ("petitioner"), was convicted of murder and attempted murder and sentenced to forty-

five years imprisonment. When his state court appeals failed, petitioner filed a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 with this court. For the reasons stated below, the court

denies the petition in its entirety.

I.     **BACKGROUND**

    **A. Procedural History**

Following a bench trial before Judge Stanley Sacks of the Circuit Court of Cook County,

Illinois, petitioner was convicted of murder and attempted murder. With the aid of new counsel,

petitioner filed a motion for a new trial alleging that his trial counsel was ineffective. After an

evidentiary hearing the court denied the motion and imposed sentence.

---

[1]Because Jerry Bohler is currently the Warden at Illinois River Correctional Center, the
court substitutes him as respondent. *See* Rule 2(a) of the Rules Governing Habeas Corpus Cases
under 28 U.S.C. § 2254

Petitioner appealed to the Illinois Appellate Court, again alleging ineffective assistance of counsel. The court upheld petitioner's conviction and sentence in an unpublished order. *People v. Raygoza,* No. 1-99-4452 (Ill. App. Ct. 1st Dist., Sept. 28, 2001)("*Ill. App. Ct.*"). Petitioner then sought relief in the Illinois Supreme Court, again rasing ineffective assistance of counsel claims, and the court denied review. *People v. Raygoza,* No. 92723 (Ill. Sup. Ct., Feb 6. 2002). Thereafter, petitioner timely filed the instant petition for a writ of habeas corpus with this court.

### B. Trial Testimony

The following facts, which petitioner does not challenge, are drawn from the Illinois Appellate Court's ruling on petitioner's direct appeal. 28 U.S.C. § 2254(e)(1); *Mahaffey v. Schomig,* 294 F.3d 907, 915 (7th Cir. 2002) (unless a habeas petitioner provides clear and convincing evidence to the contrary, a determination of a factual issue by a state court is presumed correct for the purposes of habeas review).

On June 4, 1997, at approximately 9:45 p.m., Miguel Macias and Hugo Munoz were shot in DeArco's Pizzeria on the southwest side of Chicago. Macias died as a result of the shooting. Two days later, police received a tip that petitioner was involved. The next day, eyewitnesses identified a photo of petitioner and, a few days later, police arrested petitioner at his mother's home in Highland Park, Illinois. Petitioner was interrogated and, after initially denying involvement in the murder, confessed through a written statement. Before trial, petitioner persuaded the court to suppress his confession.

2

### 1. The State's Case

Petitioner opted for a bench trial before Judge Sacks and the following evidence was adduced. Three members of a street gang, including one of the victims, testified that on June 4, 1997, they visited DeArco's Pizzeria located on Chicago's southwest side. While inside, they stated than a Hispanic individual entered and flashed a rival gang sign. All three identified that person as petitioner's co-defendant, Leslie Matos. Matos then left the restaurant, and shortly thereafter another individual entered, who all three identified as Raygoza. Once inside, petitioner, pulled out a pistol and pointed it towards them, while Matos stood in the doorway shouting "kill him, kill him, shoot him." Petitioner then began shooting. They tried to escape out the back of the store, but petitioner's bullets hit Munoz in the arms and buttocks and Macias in the back.

A fourth witnesses, James Parker, corroborated portions of the above testimony. Parker testified that he, his fiancée, and his daughter, were walking past DeArco's at about 9:40 p.m. on June 4, 1997, when he saw two Hispanic males standing in the pizzeria's doorway. Parker heard one of them shout "kill him, shoot him, kill him," and then heard six or seven shots.

A fifth witness, Jennifer Calatayud, testified that on June 4, 1997, shortly after 8:00 p.m., she saw petitioner and Matos outside a party on the southwest side of Chicago. She spoke with Matos who told her that he had "something to do" and would meet her later. About an hour later, she met Matos at his home. She testified that he was out of breath and told her that "the boys" had shot somebody at a pizza place.

The State called a sixth witness against petitioner, Raul Quezada. Quezada, a fellow gang member, testified that, a few days before the attack, he had heard petitioner and Matos

3

discuss their plans to kill a member of the victim's gang in retaliation for an earlier shooting. On June 4th, the night the shooting, Quezada testified that he accompanied petitioner and Matos to DeArco's Pizzeria, and spotted some rival gang members inside. Petitioner told Quezada to watch for police. Quezada then testified that he saw petitioner hand Matos a gun and the two entered the restaurant. A few minutes later he heard shots and ran away. Quezada also testified that he saw Matos a few days after the shooting, and Matos bragged about shooting some rival gang members.

### 2. Petitioner's Defense

Petitioner's trial counsel, Thomas Brandstrader, attacked the prosecution's case primarily through cross-examination of its witnesses. Brandstrader's examinations revealed that Quezada had changed his story regarding petitioner's participation in the shooting shortly before trial. Brandstrader further revealed that Calatayud, another prosecution witness, had similarly changed her story on the eve of trial.

Additionally, Brandstrader presented an alibi defense. Brandstrader called petitioner's girlfriend, Desiree Moyet, who testified that she spent the night of June 4th with petitioner at his mother's home in Highland Park, Illinois watching movies and eating pizza.

### 3. Motion for New Trial

Prior to sentencing, petitioner filed a motion for a new trial claiming that Brandstrader failed to adequately present an alibi defense or conduct a through pre-trial investigation. To support these claims, petitioner attached affidavits from seven alibi witnesses who were prepared to testify but were never called. Petitioner also presented a number of telephone records to

4

corroborate the uncalled witnesses's testimony. The court held an evidentiary hearing and the following evidence was adduced.

Petitioner's mother, Maria Raygoza, testified that on June 4th, 1997, the night of shooting, she was celebrating her 40th birthday in her Highland Park, Illinois home. She explained that at around 8:00 p.m., she arrived home with her daughter, Crystal, and her friend, Chloe Gavin, and began preparing for the party. Soon afterwards, she received a telephone call from another friend, Noemi Cordova, asking for directions. Maria then claimed that she left to escort Cordova to her home. At around 9:00 p.m., Maria explained that she, Gavin, and Cordova, arrived back home and found petitioner waiting for them. Maria claims that she socialized with her friends until 10:15 p.m., and then drove petitioner and his girlfriend to Chicago. After dropping off petitioner's girlfriend, Maria claims that she and petitioner stopped at her office to retrieve some documents. While gathering the documents, Maria claims that petitioner used the office telephone to call his girlfriend, Desiree Moyet. Maria submitted telephone records, which confirm a ten minute call from Maria's office to Moyet's residence around 11:00 p.m on June 4th.

Maria then testified that she and petitioner returned to Highland Park. Maria further testified that the next morning she drove petitioner from Highland Park to Chicago and petitioner departed her company. That evening, Maria claims that petitioner called and explained that he might get blamed for a shooting.

Maria's friend, Noemi Cordova, testified next. Cordova claimed that she was invited to celebrate Maria's birthday and got lost driving. Cordova then testified that she called the Raygoza residence for directions and petitioner answered. Cordova submitted telephone records

5

that show a telephone call placed from Cordova's cellular phone to petitioner's Highland Park home on June 4th at around 8:00 p.m. Cordova also testified that she saw petitioner when she arrived with Maria. Cordova explained that petitioner and his girlfriend spent the evening watching movies and eating pizza. On cross-examination, however, Cordova admitted that she did not initially want to get involved in the case, but later changed her mind.

Louis Paredes, Cordova's fourteen year-old son, also testified. He claimed that he was with Cordova that evening, and corroborated the major events she described, including seeing petitioner at the Highland Park home.

Petitioner's two siblings, Vincent and Crystal, who were fifteen years-old and thirteen years-old at the time, similarly testified to seeing petitioner at home the evening of June 4th, and both saw him leave the house with Maria around 10:00 p.m.

Petitioner also called Maria's employer, Wendy Morgan. Morgan testified that she called Maria's home on the evening of June 4th, at about 9:15 p.m., and petitioner answered the phone. Morgan introduced a telephone record that shows a twenty-three minute phone call from Morgan's home to petitioner's home beginning at 9:15 p.m.

Petitioner next called Morgan's husband, Rodney Adams, who claims to have overhead his wife's conversation with petitioner, as Morgan was talking through a speaker-phone located in the couple's bathroom.

Petitioner further offered the testimony of two witnesses who were on the southwest side of Chicago the evening of the shooting. Both these witnesses went to a party that petitioner was apparently attending. Christina Cortes, testified that she was that the party from 2:30 p.m. to 11:00 p.m., but did not see petitioner there or anywhere in the neighborhood. Another witness,

6

Teena Rodriguez, similarly testified that she did not see petitioner at the party, but later, on cross-examination, admitted that she had left the party prior to 6:00 p.m., and that she did not know whether petitioner showed up after she left.

The State also called a number of witnesses at the hearing. The most important witness was Brandstrader, who provided explanations for not calling each of petitioner's alibi witnesses. Brandstrader explained that he chose to present petitioner's alibi through only one witness, Moyet, because the other witnesses had credibility problems or were otherwise impeachable.

At the conclusion of the hearing, the trial court found that Brandstrader presented reasonable strategic reasons for not presenting petitioner's proposed alibi witnesses, and found nothing deficient with petitioner's representation at trial. After the court imposed sentence, petitioner timely appealed to the Illinois Appellate Court, which affirmed the trial court's decision. Petitioner then sought relief in the Illinois Supreme Court, and the court denied review. Having exhausted his state court remedies, petitioner filed the present petition.

## II.    HABEAS CLAIMS

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("ADEPA"), a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,* 529 U.S. 362, 404-05 (2000). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to

7

ours." *Williams*, 529 U.S. at 404. To demonstrate an "unreasonable application" of clearly established federal law, a habeas petitioner must establish that the state court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. Moreover, the state court's application of Supreme Court precedent must be more than incorrect or erroneous. Rather, it must be "objectively" unreasonable. *Lockyer v. Andrade,* 123 S.Ct. 1166, 1174 (2003); *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002)(state court decision must lie "well outside the boundaries of permissible differences of opinion").

In addition, before a federal court will consider a habeas corpus petition, a petitioner must satisfy several procedural requirements. First, a petitioner must exhaust state remedies – that is, the petitioner must give the state's highest court an opportunity to address each claim. *O'Sullivan v. Boerckel,* 526 U.S. 838, 839 (1999). To satisfy this requirement, a petitioner must fairly present to the state judiciary both the operative facts and legal principles that control each claim. *Wilson v. Briley,* 243 F.3d 325, 327 (7th Cir. 2001). A petitioner's failure to fairly present each habeas claim to the state's highest court leads to a default of the claim, thus barring the federal court from reviewing the claim's merits. *Boerckel,* 526 U.S. at 848. A federal court, however, may excuse a procedural default if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

## A.  Procedurally Defaulted Claims

The State argues that petitioner procedurally defaulted a number of his claims because he failed to present them in his petition to the Illinois Supreme Court. Petitioner disagrees, and

8

claims that he has diligently pursued all aspects of his Sixth Amendment Claim to the state's highest court. Alternatively, petitioner argues that even if he failed to raise certain claims, this court should excuse his default, because to do otherwise would result in a fundamental miscarriage of justice.

Petitioner's Sixth Amendment claims divide into three categories. Petitioner first presents a number claims regarding Brandstrader's failure assert his alibi defense. These claims include Brandstrader's failure to interview or present known alibi witnesses, and Brandstrader's failure to introduce certain physical evidence, namely telephone records, to corroborate the witnesses' testimony. Petitioner's second set of claims regard specific deficiencies in Brandstrader's pre-trial investigation. These claims include Brandstrader's failure to interview the State's eye-witnesses before trial, and Brandstrader's failure to uncover the real shooter's identity which, petitioner claims, a proper pre-trial investigation would have revealed. Petitioner's final claim criticizes Brandstrader's cross-examination of a prosecution witness, Jennifer Calatayud.

Petitioner's first set of claims, the alibi-related claims, were fully and fairly presented in state court. In petitioner's submissions to the Illinois Appellate Court, he describes Brandstrader's failure to call alibi witnesses and present corroborating physical evidence with appropriate citations to relevant authority, including *Strickland v. Washington* 466 U.S. 668 (1984). Petitioner's brief to the Illinois Supreme Court again raised Brandstrader's failure to sufficiently present his alibi defense. Although this later presentation is not as well-supported as petitioner's appellate court submissions, it nevertheless satisfies the presentment requirements sufficient to avoid default. Petitioner's Illinois Supreme Court petition offers detailed factual

9

summaries of the witnesses' testimony and numerous citations to relevant authority. Thus, petitioner has presented both the "operative facts" and the "controlling legal principles" on which his claim was based. *See Sweeny v. Carter*, 361 F.3d 327, 333 (7th Cir. 2004) (finding that a petitioner fairly presents his federal claim to the state court when he articulates both the operative facts and the controlling legal principles on which his claim is based).

In contrast, petitioner's second set of claims, those related to Brandstrader's pre-trial investigation, were not fully and fairly presented to the state's highest court. First, petitioner's claim that Brandstrader failed to interview eye-witnesses before trial was not properly raised in either his brief to the Illinois Appellate Court or his petition to the Illinois Supreme Court. Petitioner cites page twenty-four (24) of his appellate court brief as proof that he presented this particular claim to the state appellate court. However, this page contains only the following sentence "[Brandstrader] conceded, however, that he never even attempted to interview any of the three eyewitnesses who had identified his client." *Ill App. Br.* at 24. This statement is not followed by citation to any relevant authority, or legal argumentation on how this investigative failure constituted deficient performance. But even if the court were to find petitioner's presentation adequate, the claim would still be defaulted because his petition to the Illinois Supreme Court contains no reference to the claim whatever. Thus, because petitioner made no attempt to present his claim to the state's highest court, the claim is procedurally defaulted. *Boerckel*, 526 U.S. at 848.

Petitioner's next claim in this second category is that Brandstrader's inadequate pre-trial investigation caused him to fail to discover the true shooter, who he maintains was fellow gang-member Eduardo Lerma. Petitioner raised this claim in his appellate brief, and the Illinois

10

Appellate Court briefly addressed the issue. *Ill App. Ct.* at 34-35. But petitioner's Illinois

Supreme Court petition abandons any meaningful pursuit of the claim. The only mention is a

one-line statement on page nineteen (19) of petitioner's petition stating that had Brandstrader

presented evidence regarding this individual's identity, petitioner would have been acquitted. *Ill.*

*Sup. Ct. Pet.* at 19. This is not a full and fair presentment of a federal claim. Petitioner's passing

reference is not supported by citations to relevant authority and contains no legal argument to

reveal the claim's constitutional underpinnings. *See Momient-El v. DeTella,* 118 F.3d 535, 539

(7th Cir. 1997)("the legal basis upon which a petitioner seeks relief must be fairly presented to

the court").

But even if the court were to overlook his procedural default, petitioner has failed to

demonstrate that the Illinois Appellate Court, in discussing this particular claim, applied

*Strickland* to the facts of his case in an objectively unreasonable fashion. The cornerstone of

petitioner's evidence supporting his claim is the testimony of David Torrent, a fellow gang

member who testified in the proceedings of petitioner's co-defendant, Matos. In that case,

Torrent explained that just before the shooting he saw Lerma walking towards the pizzeria and

then heard shots. Torrent also testified that he believed Lerma had a motive for shooting the

victims. Further questioning revealed that Lerma never contacted the police, states' attorney, or

petitioner's or Matos's attorneys with this information even though he knew petitioner and Matos

were being charged with the offense. Torrent was also impeached with several felony

convictions.

Petitioner has not explained how this testimony would have altered the trial court's

determination in any way, nor can this court see how its absence prejudiced petitioner. In fact,

11

the Illinois Appellate Court noted that the trial court made specific findings that Torrent was not a credible witness and that Torrent's physical description of Lerma conflicted with the State's eye-witness descriptions of petitioner. *Ill. App. Ct.* at 35. Petitioner has not persuaded this court that Torrent's testimony was so crucial to petitioner's defense that Brandstrader was constitutionally ineffective for not calling him as a defense witness. In fact, petitioner has not demonstrated that Brandstrader even knew, or should have known, of Torrent's existence before trial. As such, Brandstrader cannot be found constitutionally ineffective for not investigating and presenting Torrent's testimony.

Petitioner's final claim regards the allegedly deficient cross-examination of a prosecution witnesses, Jennifer Calatayud. This particular claim was fully presented in his state appellate brief and then raised again in his petition to the Illinois Supreme Court. Because petitioner raised the issue at each and every state court level, the court may address the claim's merits.

To summarize, the court finds that those claims regarding Brandstrader's failure to interview eye-witnesses, and failure to identify the "true" shooter's identify are procedurally defaulted. All others are preserved for review.

Before turning to the merits of petitioner's non-defaulted habeas claims, the court must consider whether to excuse any of petitioner's procedural defaults. It is well established that a procedural default will be excused if the petitioner can establish either "cause and prejudice" for the default, or that a fundamental miscarriage of justice would result if the claim were not considered. *Coleman,* 501 U.S. 722 at 750 (1991).

Petitioner does not argue "cause and prejudice," but rather argues that a fundamental miscarriage of justice would result if this court did not consider each and every one of his Sixth

12

Amendment claims. The miscarriage of justice exception applies to the "extremely rare" and "extraordinary case" where a petitioner is *actually innocent* of the crime for which he is imprisoned. *Schlup v. Delo,* 513 U.S. 298, 321 (1995) (emphasis added); *see also Calderon v. Thompson,* 523 U.S. 538, 559 (1998) ("Given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected."). To prove actual innocence the petitioner must come forward with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup,* 513 U.S. at 324. The petitioner must also establish that "it was more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

To meet this stringent standard, petitioner claims that had a reasonable trier of fact heard the omitted evidence, namely the alibi testimony and corroborating phone records and evidence regarding the "true" killer's identity, he probably would have been acquitted. Other than this conclusory statement, petitioner makes no attempt to bolster his claim of actual innocence with any new evidence, reliable or otherwise. Petitioner's efforts fall considerably short of the "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" required to demonstrate actual innocence. *Id.* Thus, the miscarriage of justice exception cannot revive his defaulted claims.

The court now turns to the merits of petitioner's remaining habeas claims.

### B. Non-Defaulted Habeas Claims

Petitioner's surviving claims regard Brandstrader's presentation of his alibi defense, and Brandstrader's allegedly ineffective cross-examination of a prosecution witnesses. Petitioner

argues that these errors deprived him of his Sixth Amendment right to the effective assistance of counsel.

### 1. Failure to Present an Alibi

Petitioner argues that Brandstrader was constitutionally deficient because he failed to interview and/or present seven of eight available alibi witnesses. Relatedly, petitioner argues that Brandstrader was also deficient for not presenting certain physical evidence, namely telephone records, to corroborate his alibi. The Illinois Appellate Court thoroughly considered the merits of this claim, and concluded that Brandstrader's performance was not unreasonable under the standards set forth by the United States Supreme Court in *Strickland v. Washington*. To reach its conclusion, the state court systematically considered the testimony of each potential alibi witness petitioner presented at the hearing on his motion for a new trial. In each case, the appellate court deferred to Brandstrader's articulated strategic reasons for not calling the witnesses. The appellate court also distinguished a number of state and federal decisions purportedly supporting petitioner's position, and ultimately concluded that petitioner had not demonstrated deficient performance. *Ill. App. Ct.* at 29, 35-36.

Before addressing the appellate court's decision, it is necessary to re-emphasize the standards under which the court must consider petitioner's claims. The ADEPA mandates that district courts defer to the conclusions of state tribunals, unless the relevant state court decision was either "contrary to" or involved "an unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1). To consider a claim in this manner necessarily contemplates a significant degree of deference. *Williams,* 529 U.S. at 410-412. Moreover, the specific instance of a Sixth Amendment claim alleging ineffectiveness of counsel mandates even greater deference

14

to state court conclusions. This is because under Section 2254 it is not enough to convince a federal habeas court that, in its independent judgment, the state court decision assessed counsel's performance incorrectly. *Id.* at 411. Rather, the habeas petitioner must show that the state court performed its analysis in an *objectively unreasonable manner. Bell v. Cone*, 535 U.S. 685, 699 (2002)(emphasis added); *see also United States v. Pierson*, 267 F.3d 544, 557 (7th Cir. 2001)(noting that ADEPA provides for clear error review of state court *Strickland* adjudications because of the inherent "element of deference to counsel's choices in conducting the litigation" in combination with the "layer of respect" added by 28 U.S.C. § 2254(d)(1))(internal citations omitted)).

Moreover, the presentation of an alibi defense necessarily requires counsel to make numerous decisions regarding which witnesses to interview and present to the factfinder. If those decisions can reasonably be deemed strategic, such decisions "are virtually unchallengeable." *Strickland*, 466 U.S. at 691 (holding that counsel's strategic decisions should be afforded wide latitude). Consequently, courts engage in a strong presumption that counsel performed adequately. *Williams v. Washington*, 59 F.3d 673, 679 (7th Cir. 1995). But simply calling a decision "strategic" does not insulate the decision from review. Rather, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 466 U.S. at 690-91. With these standard in mind, the court turns to petitioner's first claim.

a. The Children

Petitioner argues that Brandstrader should have called the three children allegedly present in petitioner's home the night of the shooting. Petitioner also argues that not only did

15

Brandstrader fail to call these children as alibi witnesses, but he also failed to interview them before trial. The Illinois Appellate Court considered petitioner's arguments and concluded that Brandstrader's reasons for not using the children were strategic. The court explained that during the hearing on petitioner's motion for a new trial, Brandstrader testified that he had adult witnesses who would have offered the same testimony, and that he believed the children's testimony would have added little, if anything, to petitioner's alibi defense. Moreover, the court noted that two of three children were petitioner's siblings, and therefore exhibited an inherent familial bias. The court therefore labeled Brandstrader's reasons not to investigate and present the children as strategic, and concluded that his performance did not fall below *Strickland*'s standards. *Ill. App. Ct.* at 28-29. This was not an objectively unreasonable application of *Strickland*.

While it is true that an attorney must engage in a reasonable amount of pretrial investigation, counsel is also permitted to make rational decisions that make particular investigations unnecessary. *Crisp v. Duckworth*, 743 F.2d 580, 583-84 (7th Cir. 1984). Here, Brandstrader offered arguably plausible strategic reasons for not interviewing the children. Perhaps an ideal defense counsel might have made the effort to determine, through a personal interview, that the children's testimony would have been merely cumulative, but *Strickland* does not necessarily require such effort. *See Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987) (defense counsel does not have to "track down every lead" or "personally investigate every evidentiary possibility before choosing a defense and developing it."). Although this court might have concluded otherwise, Brandstrader has articulated a number of reasonable strategic reasons why in his professional judgment he believed the children's testimony was not essential to

16

petitioner's alibi defense, this court cannot say that the state court's decision applying *Strickland* was objectively unreasonable.

### b. Maria Raygoza

Brandstrader also decided not to call petitioner's mother, Maria Raygoza, as an alibi witness. Petitioner argues that this decision clearly demonstrates deficient performance, because Maria could have testified to numerous facts supporting petitioner's alibi, including petitioner's attendance at her 40th birthday party the evening of the shooting and the telephone call to Moyet's home from Maria's office shortly after the murder. The state court disagreed that Maria was an essential alibi witness, and credited Brandstrader's strategic reasons for not presenting her testimony. The state court noted that Maria had testified earlier (during a hearing on petitioner's motion to suppress his confession) that petitioner had called her the day after the shooting explaining that he might get blamed for murder. The court explained that Brandstrader legitimately feared that this testimony, if brought out through cross-examination, would damage petitioner's case. *Ill. App. Ct.* at 32 (finding that petitioner's phone call "appears to be incriminating in nature and one that a competent attorney would not want before the trier of fact."). The court also defended Brandstrader's reasons for not calling Maria by explaining that she was his mother, and would therefore exhibit an obvious filial bias. Perhaps most important, the appellate court relied heavily on the trial court's factual finding, which petitioner does not now challenge, that Brandstrader met with Maria "30 times" before trial, and throughly investigated the possibility of using her to bolster petitioner's alibi. *Id.* at 28. In the end, Brandstrader determined that she would not make a good witness, and the state court deferred to this strategic decision. *Id.* at 28. This conclusion was not objectively unreasonable.

17

Brandstrader articulated a number of strategic reasons for not calling Maria, all of which could fairly be deemed a reasonable exercise of professional judgment. This is not a case where counsel has failed to investigate a potential lead, or has neglected his pre-trial duties to develop a viable defense theory. As found by the state court, Brandstrader met with Maria 30 times prior to trial, and it is not for this court to second guess Brandstrader's informed decision to keep her off the witness stand. Moreover, Brandstrader explained that Maria might reveal potentially incriminating information which, on balance, could have hurt his client. An attorney's decision not to present a particular witness "can be strategically sound if based on the attorney's determination that the testimony the witness might give would on balance harm rather than help his client." *Hall v. Washington,* 106 F.3d 742, 749 (7th Cir. 1997). Again, although this court might have reached a different conclusion, because Brandstrader was able to articulate reasonable strategic reasons for not calling Maria, the court cannot find that the appellate court unreasonably applied *Strickland* to the facts of this case.

c. Noemi Cordova

Petitioner argues that Brandstrader should also have called Maria's friend, Noemi Cordova, because Cordova could have confirmed that petitioner was in Highland Park the night of the murder. The appellate court considered this argument and once again deferred to Brandstrader's articulated strategic reasons for not calling Cordova. At the hearing on petitioner's motion for a new trial, Brandstrader testified that Cordova was a particularly uncooperative witness, who repeatedly expressed reluctance about being used as an alibi witness. Brandstrader further testified that when she finally agreed to testify, it took his investigator three days to track her down. Lastly, Brandstrader explained that Cordova failed to show up at trial at

18

the appointed time, and Brandstrader did not locate her until after the trial had concluded. The trial court found Brandstrader's testimony credible, and the appellate court found no reason to overturn the lower court's finding. This permitted the court to conclude that Brandstrader's reasons for not calling Cordova were strategic and reasonable. *Ill. App. Ct.* at 28. This was not an objectively unreasonable application of *Strickland*.

If, as the state court chose to believe, Ms. Cordova was not cooperating, then a prudent defense counsel might well be correct to exercise caution before relying on such a witness. Petitioner, however, urges this court to disregard Brandstrader's testimony that Ms. Cordova was uncooperative because, he claims, the record does not support Brandstrader's allegations. But this argument misunderstands the posture of this court's review. The state court found Brandstrader's testimony credible, and made certain and definite findings in this regard that petitioner makes no attempt to challenge. Simply by asking this court to disregard the state court's findings misapprehends the deference that this court must extend to state court factual findings. *See Harding v. Walls,* 300 F.3d 824, 828 (7th Cir. 2002) ("[R]elief may be had where the petitioner can show by clear and convincing evidence that the state court's factual determinations were unreasonable."). Because the state court found that Brandstrader's decision not to call Cordova was based on reasonable strategic decisions, and petitioner has not demonstrated the unreasonableness of this conclusion, this court cannot find that the Illinois Appellate Court misapplied *Strickland* to the facts of his case.

### d. Wendy Morgan and Rodney Adams

Petitioner further claims that Brandstrader should have called Wendy Morgan and her husband, Rodney Adams, because both heard petitioner's voice over the telephone when they

19

called his Highland Park home on the night of the murder. In reviewing this argument, the Illinois Appellate Court began by noting that Brandstrader had met with Morgan and Adams at least twice, understood their potential use as alibi witnesses, and ultimately concluded that their testimony would prove unhelpful. Additionally, the court credited Brandstrader's stated reasons on which he based his decision, which included inconsistencies in Morgan's and Adams' testimony, their alleged reaction of relief when Morgan learned of Brandstrader's decision not to call her, the fact that Morgan had lied to him about how she came to learn about murder, and, most importantly, that Morgan never saw petitioner the night of murder, but claims only to have spoken to him briefly on the telephone.[2] The state court determined that Brandstrader's reasons were strategic in nature, and the result of an adequate investigation into their value as alibi witnesses. As such, the court found that Brandstrader's decision not to present Morgan and Adams' testimony did not violate *Strickland's* performance standards. *Ill. App. Ct.* at 28.

Although this court is troubled by Brandstrader's professed reason for not calling Morgan and Adams, the court cannot find the state court's decision objectively unreasonable. It appears that these witnesses could have put petitioner in Highland Park shortly before the murder on the southwest side of Chicago. Again, however, the state court considered the evidence and applied *Strickland* in a manner that cannot be second-guessed by a federal habeas court.

e. Failure to Present Telephone Records

Petitioner also claims that Brandstrader acted unreasonably in failing to present telephone records to corroborate his alibi. In addressing this claim, the state court identified three sets of

---

[2]Morgan's husband, Adams, did not even speak to petitioner, but only overheard his wife's conversation on a speaker phone.

telephone records. These included records from: 1) Morgan's home to petitioner's home; 2) Cordova's cellular phone to petitioner's home; and 3) Maria's office to petitioner's girlfriend's home. Petitioner argues that these telephone records significantly corroborated his alibi. In discussing this claim, the Illinois Appellate Court first observed that the telephone records do not reflect who made the calls or who answered them. The court also noted that the records do not establish that petitioner took part in any of the calls. And perhaps most important, the court reasoned that even if the telephone records corroborated the witnesses' testimony, such corroboration did little to impact the validity of Brandstrader's strategic choices not to call the witnesses in the first place. Based on these observations, the court concluded that Brandstrader's failure to produce the telephone records did not violate *Strickland*'s performance standard. *Ill. App. Ct.* at 30. This finding is not objectively unreasonable.

The appellate court provided logical reasons for its conclusion regarding Brandstrader's decision not to introduce the telephone records. Given the high level of deference mandated by *Strickland* to Brandstrader's choices, petitioner has not persuaded the court that habeas relief is warranted here. That said, the court notes that the call made from Maria's office to petitioner's girlfriend's house only a few hours after the shooting might have supported petitioner's alibi.[3] Despite this observation, the court cannot say that this single telephone call represents such an obvious piece of exculpatory evidence as to render the state court's application of *Strickland* objectively unreasonable. Petitioner had an opportunity to convince the trier of fact, and the court on appeal, that the referenced phone call was so important to petitioner's alibi that

---

[3]The State, however, argues that Maria Raygoza did not inform Brandstrader about this phone call until after trial. If true, this could explain Brandstrader's failure to present the information at trial.

21

Brandstrader was ineffective by not presenting the evidence. He did not. And so long as the appellate court's conclusions in this regard are at least minimally consistent with the facts and circumstances of the case, which this court has concluded they are, relief must be denied. *See Schaff v. Snyder*, 190 F.3d 513, 523 (7th Cir. 1999)(finding that a court should uphold a state court decision that are "minimally consistent with the facts and circumstances of the case").

### f. Brandstrader's Refusal to Present an Alibi Defense

Petitioner also argues that Brandstrader refused to cooperate in formulating his alibi defense. In support of this argument, petitioner submits a letter that Brandstrader wrote his mother, Maria Raygoza, shortly before trial that states, "alibis don't work." The letter also describes Brandstrader's specific concerns regarding the credibility of petitioner's proposed alibi witnesses, and sets forth Brandstrader's trial strategy, which was to attack the State's eye-witnesses through vigorous cross-examination. Petitioner claims that the letter reveals Brandstrader's refusal to seriously consider petitioner's alibi defense. The Illinois Appellate Court addressed this argument and noted that, contrary to petitioner's assertions, Brandstrader did in fact put on an alibi defense. The court explained that petitioner's girlfriend, Moyet, testified as an alibi witness and offered an alternative version of the evening's events, which placed petitioner in Highland Park celebrating his mother's 40th birthday. *Ill. App. Ct.* at 33. ("We find that the record as a whole reflects that Brandstrader did not reject an alibi defense as 'out-of-hand.' Instead he made a decision to present what he thought to be the best alibi witness while declining to put other potential alibi witnesses on for stated strategic reasons."). The court also determined that petitioner overstated the significance of Brandstrader's letter, particularly Brandstrader's remark that "alibi's don't work," and noted that Brandstrader undertook an

22

adequate investigation of a petitioner's proposed alibi, despite any bias Brandstrader might have harbored against alibis in general. The court therefore concluded that because Brandstrader worked with petitioner to formulate an alibi defense, and made reasonable efforts to present such a defense before the trier of fact, Brandstrader's performance did not fall below *Strickland's* standards. *Id.* at 32-33. This was not an objectively unreasonable application of *Strickland*.

This is not a case where counsel has completely failed to put on an alibi defense, were a viable alibi was available. The trial court found that Brandstrader met with Maria Raygoza some 30 times prior to trial and also interviewed other potential alibi witnesses. After making what the state court determined were reasonable strategic decisions, Brandstrader decided that petitioner's alibi was unconvincing, but nevertheless attempted to present such a defense before the trier of fact. Despite this, petitioner argues that Brandstrader's failure to investigate prevented him from discovering the most basic and essential facts of his alibi. This argument is unpersuasive for two reasons. First, it is contrary to the appellate court's determination that "Brandstrader demonstrated, through his testimony, that he knew a great deal about the alibi defense." *Id.* at 31. Second, by labeling the omitted facts as "basic" and "essential," petitioner asks this court to assume that such facts were *true*. Put another way, the omitted facts become "essential" to petitioner's alibi only if they are, in fact, believable. But other than a general rehashing of testimony, petitioner offers little argument to demonstrate the witnesses' veracity.

Moreover, to assume that the witnesses's testimony was all true contradicts many of the trial court's factual findings regarding the witnesses' credibility, which are presumed correct for purposes of this court's review. *See Ellsworth v. Levenhagen*, 248 F.3d 634, 638 (7th Cir. 2001) ("[S]tate court factual findings that are reasonably based on the record are accorded a

presumption of correctness."). Accordingly, Brandstrader cannot be deemed incompetent for failing to fully investigate an alibi that Brandstrader, in the exercise of his professional judgment, determined to be less than convincing. For these reasons, petitioner has not demonstrated that the Illinois Appellate Court applied *Strickland* in an objectively unreasonable fashion.

### g. Relevant Authority

Lastly, it is necessary to distinguish a number of authorities that petitioner claims support his position. Petitioner relies heavily on *Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003), for the proposition that failure to investigate potentially exculpatory alibi witnesses constitutes ineffective assistance of counsel. Petitioner's reliance on *Hampton* overlooks a critical distinction between this case and *Hampton*. In *Hampton*, the district court had conducted a *full evidentiary hearing* regarding counsel's purported strategic reasons failing to contact three exculpatory eye-witnesses. At the conclusion of the hearing, the court made a number of findings discrediting counsel's testimony. These determinations were essential to the court's finding of ineffective assistance. Unlike the district court in *Hampton*, this court does not have the same latitude to assess Brandstrader's credibility regarding his stated reasons for not using various witnesses. That task was already performed by the state trial court, and affirmed by the Illinois Appellate Court. ADEPA mandates that absent "clear and convincing evidence" of unreasonableness this court cannot disturb the state court's findings. *See* 28 U.S.C. § 2254(e)(1); *Harding*, 300 F.3d at 828. Because petitioner does not offer any such evidence, *Hampton*'s conclusions are, for the most part, inapplicable here.

Petitioner also claims that *Montgomery v. Peterson*, 846 F.2d 407 (7th Cir. 1988), supports his claim. In *Montgomery*, the court noted that Brandstrader's investigative failures

24

were not related in any way to trial tactics or strategy, but were the result of serious errors in professional judgment. In fact, the petitioner's counsel admitted on examination that his reasons for not following critical leads stemmed from "inadvertence" and "disbelief of [the defendant]" rather than strategy. *Id.* at 411. Additionally, in *Montgomery* the court found that trial counsel failed to interview the only available *disinterested* alibi witness, and the remaining uncalled alibi witnesses were unimpeachable. *Id.* In contrast, Brandstrader lacked a genuinely disinterested alibi witness (all the potential witnesses were either friends or close family), and the state court determined that a number of his witnesses were, in fact, impeachable. These distinctions render *Montgomery* inapplicable here.

Finally, petitioner claims that this court's decision in *Berry v. Gramley,* 74 F.Supp.2d 808 (N.D. Ill. 1999), compels a decision in his favor. But *Berry* is easily distinguishable. In *Berry,* this court, after holding an evidentiary hearing, found counsel's performance deficient because he neglected to interview an exculpatory *eye-witness* to the crime. Here, the omitted testimony was from *alibi* witnesses. The distinction is not altogether unimportant because, in *Berry,* the uncalled eye-witness, as a witness to the crime itself, contradicted the State's case, whereas petitioner's alibi witnesses would not have directly challenged the State's primary evidence. Moreover, the credibility of the uncalled eye-witness in *Berry* was never placed in doubt, whereas the credibility of petitioner's alibi witnesses was repeatedly questioned. But most important, in *Berry* this court determined that counsel had engaged in virtually no pre-trial preparation, had spoken to his client on only two occasions, did not understand his client's theory of the case, made no attempt to present exculpatory evidence, and committed perjury to the state court and the Illinois Attorney Registration and Disciplinary Commission. Brandstrader's

25

behavior in the instant case, thankfully, does not even come close to the incompetence and duplicity of counsel in *Berry*.

In sum, petitioner has failed to adduce any argument to show that the Illinois Appellate Court unreasonably applied *Strickland* to the facts of his case. Accordingly, petitioner's claim regarding Brandstrader's failure to present an alibi defense must fail.[4]

### 2. Failure to Cross-Examine State Witness

Petitioner's final claim is that Brandstrader failed to properly cross-examine one of the prosecution's witnesses, Jennifer Calatayud. As explained previously, Calatayud testified that she saw petitioner and co-defendant Matos outside a party on the southwest side of Chicago just before the shooting. On cross-examination, Brandstrader elicited that Calatayud had changed her story regarding petitioner's whereabouts a few months prior to trial. Petitioner now claims that while Brandstrader's cross-examination managed to reveal this inconsistency, it did not place her testimony in sufficient doubt so as to completely undermine her credibility. Petitioner further claims that Brandstrader should have called other witnesses, namely Teena Rodriguez and Christina Cortes, who could have further contradicted Calatayud's testimony.

The Illinois Appellate Court considered this claim and found that Brandstrader performed within *Strickland*'s performance standards. The court noted that in addition to revealing that Calatayud had changed her story, Brandstrader also asked the court to not consider her testimony against petitioner. The court further found that Brandstrader emphasized Calatayud's

---

[4]Because petitioner has not demonstrated a deficiency in Brandstrader's performance, his claim does not clear the first hurdle of the *Strickland* test, and the court has no occasion to address the prejudice prong. *See Hough v. Anderson,* 272 F.3d 878, 890 (7th Cir. 2001)(failure to establish either prong is fatal to an ineffective assistance of counsel claim).

inconsistent statements during closing arguments. Based on these observations, the court concluded that Brandstrader's cross examination was "[not] ineffective in any way." *Ill. App. Ct.* at 34.

Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. *See, e.g., Willis v. United States,* 87 F.3d 1004, 1006 (8th Cir. 1996)("there are a few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would pass muster."). Here, Brandstrader did ask Calatayud a few pointed questions and emphasized her inconsistencies during closing argument. Petitioner is correct that Brandstrader's examination was not particularly meaningful and thorough, but it did not render his performance so unreasonable as to constitute ineffective assistance. The failure of counsel to develop every bit of testimony through all available inconsistent statements to impeach witnesses is not necessarily unprofessional or ineffective assistance of counsel, particularly where a petitioner was not prejudiced as a result of the alleged errors. *Poyner v. State of Iowa*, 990 F.2d 435, 438 (8th Cir. 1993). Petitioner does not explain how a more rigorous cross-examination of Calatayud would have had any effect on the outcome of the proceedings. Petitioner's related claim that he was prejudiced because Brandstrader did not call Teena Rodriguez and Christina Cortes does not alter this conclusion. Based on the statements given at the post-trial hearing, Cortes and Rodriguez would have offered little, if anything, to contradict Calatayud's testimony. Both witnesses admitted that they could not definitively say whether petitioner was at the party where Calatayud placed petitioner on the night of the shooting.

Lastly, petitioner argues that the state court's decision regarding Brandstrader's cross-examination is contrary to the Seventh Circuit's application of *Strickland* in *Dixon v. Synder,* 266 F.3d 693 (7th Cir. 2001). *Dixon* is distinguishable from the present case. First, Dixon's trial counsel did not even attempt to cross examine the sole direct witness against his client, who had recanted his previous testimony. *Id.* at 703. In contrast, Brandstrader cross-examined Calatayud, and brought out that she changed her story shortly before trial. Additionally, in *Dixon,* the testimony presented by the uncrossed witness offered was direct and damaging testimony regarding the defendant's participation in the crime. *Id.* at 704-05. Here, Calatayud's testimony was, at best, circumstantial, and offered little evidence regarding petitioner's actual participation in the crime itself. Petitioner's reliance on *Dixon* is therefore misplaced.

In sum, the Illinois Appellate Court determined that Brandstrader's examination, while brief, revealed the inconsistency between Calatayud's prior out-of-court statement and later trial testimony, and that Brandstrader emphasized this inconsistency to the court following his examination and during closing statement. Because petitioner has not offered anything to demonstrate that the Illinois Appellate Court's conclusions regarding Brandstrader's cross-examination of Calatayud were objectively unreasonable, his second and final claim must also fail.

## III. CONCLUSION

This court is disturbed by the conduct of defense counsel Brandstrader, who appears to have failed to present an effective alibi defense at petitioner's trial. Although Brandstrader was able to identity potential flaws in the testimony of most all of the alibi witnesses taken individually, it seems to this court that presenting all the witnesses who could have established

that petitioner was not at the scene of the murder when it occurred, as well as the corroborating documentary evidence, might well have had a significant impact on the outcome of the trial. Rather than being "cumulative," such a presentation would have forced the prosecution into the difficult position of attempting to prove that all of these witnesses were committing perjury. The fact that Brandstrader did not even know that all these people were at petitioner's mother's home to celebrate her birthday, and did little investigation into the circumstances surrounding petitioner's whereabouts during the evening in question, diminishes the reliability of his explanations.

Yet, despite this court's misgivings, the court concludes that it lacks the authority to second-guess the state courts that have reviewed this case and determined, after properly applying the *Strickland* standards, that Brandstrader's performance was not constitutionally ineffective. The fact that the same judge who conducted the bench trial also heard from all the alibi witnesses and Brandstrader at the post-trial proceeding lends significant weight to the conclusions reached at the state level. Moreover, no party has suggested that this court conduct an evidentiary hearing to determine whether Brandstrader had testified falsely at the post-trial proceeding; it was in connection with such an evidentiary hearing that the perjury of defense counsel in *Berry* was exposed. *Berry,* 74 F.Supp.2d at 816-17. Finally, Brandstrader's continuous refusal to present the alibi witnesses demanded by petitioner and his family was known to them sufficiently in advance of trial to have allowed them ample time to seek to replace him. The record simply does not support substituting this court's judgment for that of the state courts that thoroughly reviewed and ultimately rejected petitioner's position.

29

For the reasons stated above, the court denies the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This case is terminated and any pending motions are denied as moot. The court wishes to express its appreciation to petitioner's counsel, Leonard C. Goodman and Lawrence C. Marshall, for their commendable efforts on behalf of Mr. Raygoza, and to all counsel for prosecuting this challenging case in a highly professional and thorough manner.

**ENTER:** **March 23, 2005**

**Robert W. Gettleman**
**United States District Judge**